Joseph V. Curran and Betty Curran v. Commissioner.
Curran v. Commissioner
Docket Nos. 381-68 - 383-68.
United States Tax Court
T.C. Memo 1970-160; 1970 Tax Ct. Memo LEXIS 199; 29 T.C.M. (CCH) 697; T.C.M. (RIA) 70160; June 18, 1970, Filed Robert E. Lageschulte and Richard F. Kroetch, 1500 I.B.M. Bldg., 1200 Fifth Ave., Seattle, Wash. for the petitioners. Stephen E. Silver, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies as follows: Docket No.
Year
Amount
383-68
1963
$5,152.08
382-68
1963
5,686.45
381-68
1964
9,103.82
*200 As a result of stipulations and concessions the only issues to be decided are whether: (1) Claremont Aircraft Company, Inc., a subchapter S corporation, [1] was engaged in a trade or business for profit in 1963 and 1964; and (2) if not, whether petitioners may deduct on their individual tax returns the losses from said corporation. General Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference. Petitioners, Joseph V. Curran (hereinafter sometimes referred to as Joseph), and Betty Burke Curran (hereinafter sometimes referred to as Betty), are husband and wife. They resided in Everett, Washington, at the time of the filing of their petitions herein. Joseph and Betty filed separate U.S. Individual Income Tax Returns for the calendar year 1963 with the district director of internal revenue at Tacoma, Washington. For the calendar year 1964 they filed a joint U.S. Individual Income Tax Return with the district director of internal revenue at Tacoma, Washington. Joseph is a licensed physician and surgeon *201 engaged as a sole practitioner in the general practice of medicine at Everett, Washington. Since 1961 Betty has been a laboratory 697 technician and X-ray technician for Claremont Laboratory, Inc. In addition to their work in the medical arts, Betty and Joseph are engaged in several businesses. Without taking into account Claremont Aircraft Company, Inc., Betty and Joseph had the following financial interests during the years 1963, 1964 and 1965: 1963
1964
1965
Claremont Laboratory, Inc., (a corporation)
100%
100%
100%
Evergreen Finance of Marysville, (a partnership)
None
a1
a1
Claremont Shopping Center, (a partnership)
50%
50%
50%
Community Finance Company, (a partnership)
None
a1
a1
Evergreen Finance of Chehalis, (a partnership)
a2
a2
a2
Desco TV & Appliance Stores, (a partnership)
None
(1/3 cap. int.
(1/3 cap. int.
(50% profits
(50% profits
Desco Camera Shop, (a partnership)
None
(1/3 cap. int.
(1/3 cap. int.
(50% profits
(50% profits
C & G Investment Company, (a partnership)
50%
50%
50%
Everett Monte Cristo Hotel, Inc., (an electing subchapter S corp.)
None
None
11.1%
Beauty Bar of Claremont, (a partnership)
None
None
50%
*202 In 1963 and 1964, Betty spent approximately 15 to 20 hours a week working for Claremont Laboratory, Inc. Betty also spent approximately 10 hours a week working at the finance companies.
Joseph's office hours for his medical practice were 11:00 to 1:00 and 2:30 to 6:00. He would also see patients at his home. During the years 1963 and 1964, Joseph spent approximately 30 to 40 hours a week managing his different business interests.
Claremont Laboratory, Inc. Claremont Laboratory, Inc., (Claremont) is engaged in the operation of a medical laboratory and X-ray service doing business as Claremont Laboratory.
Petitioners acquired all the issued stock of Claremont when it was incorporated under the laws of the State of Washington in September 1958.
Claremont was operated as a separate entity apart from Joseph's medical practice, although it is located in the same building and is contiguous to Joseph's office. Claremont rents office space from the petitioners. In 1963 and 1964, approximately 95 percent of Claremont's gross income came from Joseph's patients.
Executive and By Air In 1959, petitioners, along with *203 Ted Dahl and John Gallagher, invested an unspecified sum of money in a fixed base operation known as Executive Air, located at Snohomish County Airport (hereinafter sometimes referred to as Paine Field). A fixed base operation involves the selling of gasoline and other services generally available at an airport.
In addition to petitioners' investment in Executive Air, they, along with Archie Baker, as partners, purchased a Cessna 175 (#1) which was leased to Executive Air. Lease payments were based upon the hours flown by the aircraft. Sometime in 1960, the Cessna 175 (#1) owned by petitioners and Archie Baker was sold.
Shortly after the Cessna 175 (#1) was sold, petitioners purchased another Cessna 175 (#2) which they leased to Executive Air. The Cessna 175 (#2) was subsequently damaged in a crash. Shortly there-after petitioners repossessed the aircraft because Executive Air had been manipulating the tachometer which was used to determine the lease payment.
In 1960, petitioners sold the Cessna 175 (#2) to the same dealer from whom they purchased a Beechcraft Debonair. The $13,000 selling price for the Cessna 175 (#2) was deducted from the purchase price of the Beachcraft Debonair. *204 Sometime in 1960, petitioners, along with other unspecified individuals, financed the acquisition of five aircraft by a fixed base operation at Paine Field known as By-Air. As security, legal title to the aforesaid five aircraft was held in the name of Claremont Aircraft Company. Because of financial reverses suffered by By-Air, the aforesaid five aircraft were repossessed. 698 Claremont Aircraft, Inc. On February 12, 1962, Betty and Joseph and John M. Warnock filed Articles of Incorporation with the State of Washington for Claremont Aircraft, Inc. (hereinafter sometimes referred to as Aircraft).
The stated purposes in the Articles of Incorporation were:
To give instructions and training in the art of navigation and aviation, installing, maintaining, and repairing aircraft and aircraft engines and accessories of all description, and in connection therewith to own and operate machine shops, laboratories, and any and all other necessary adjuncts.
To manufacture, construct, buy, sell, lease and charter, hire, import, export, and deal in and with airplanes, hydroairplanes, hydro-planes, sea-planes, flying boats, and all other kinds of aircraft whatsoever, motors, machines *205 and devices of whatever kind and description for the utilization of air and gas or gasoline or for any use or purpose to which the same can be applied; and to manufacture, construct, buy, acquire, sell, import and export, deal in and with all parts that may or can be used in the manufacture of the aforementioned articles or in connection therewith.
Aircraft elected to be taxed as small business corporation (section 1371 et seq.) on March 7, 1962. It is stipulated that petitioners are its sole shareholders.
On its income tax return for 1963, Aircraft stated that its business was "Aircraft Sales, School & Charter." On its returns for 1964 and 1965, Aircraft stated that its business was "Aircraft Sales & Charter." Aircraft's 1966 and 1967 returns stated "Aircraft Sales & Charter Service."
In August 1962, Aircraft traded four small aircraft to Flightcraft, Inc., Portland, Oregon, for one large plane which was a twin-engine Beech Travelair (hereinafter sometimes referred to as Travelair) with a basis of $48,000. One of the aircraft traded for the Travelair was the Beechcraft Debonair that had been purchased in 1960 for cash and the Cessna 175 (#2). In May 1965, the Travelair was resold *206 to Flightcraft, Inc., for $32,400. From August 1962 through May 1965, Aircraft owned one aircraft, the Beech Travelair. Minor mechanical and maintenance services were performed for Aircraft by Lee Easterly (hereinafter sometimes referred to as Easterly). In return for this work he was allowed a credit for this work he was allowed a credit against charges he would have had to pay to use the aircraft. Aircraft had no employees, and Easterly is not a Certified Airframe and Power Plant Mechanic.
Address and Hours In its application for an aircraft dealer's license for 1964 and 1965, Aircraft listed as the "address under which Dealer's Business is conducted," "5007 Claremont Way, Everett, Washington." This is the address of Joseph's medical clinic. All of petitioners' business interests were operated out of an office located there. Betty, as secretary-treasurer of Aircraft, considered 5007 Claremont Way as the address where all of Aircraft's business was carried on. There were no signs at 5007 Claremont indicating that Aircraft was located or conducted business there.
Aircraft did not maintain regular business hours at any location.
Physical Plant Since February 1961, Aircraft has *207 leased a hanger at Paine Field. The lease for the hangar had a provision which prohibited the lessee from engaging in any commercial aircraft business without the approval of the airport manager. This provision was scratched out by Joseph. The airport manager contacted Joseph to inquire as to why this provision was deleted. Joseph told him that he had an interest in an airport in California and also a radio dealership and, therefore, did not believe that the provision was in harmony with those interests.
The airport manager at Paine Field was not aware that Joseph and Betty Curran were conducting a business at the airport. He knew of no instances, during the years 1963, 1964, and 1965, when the aircraft owned by petitioners was chartered.
A commercial aircraft operator pays more rent for the lease of a hanger at Paine Field than a noncommercial aircraft owner. If the airport company had believed that Joseph was chartering and selling aircraft, it would have canceled the hangar rental agreement because a lease similar to those in effect with commercial aircraft operators would have been required.
Chartering In 1963, 1964, and 1965, Aircraft did not have an "air taxi/commercial *208 operator (ATCO) operating certificate." In the parlance of Federal Aeronautics Administration (hereinafter sometimes referred to as 699 FAA) terminology, the term "charter servvice" is synonymous with "air taxi service." Any person operating a charter service is required under FAA regulations to have an air taxi certificate. Before granting a simple air taxi certificate the FAA examines the qualifications of the pilot and the aircraft. When and if petitioners flew charter flights, they individually violated the Federal Aviation Regulations.
Ground School Ground schools are regulated by the FAA only if they request FAA approval. A ground school can be operated even though it is not approved by the FAA. Aircraft did not conduct an FAA approved ground school.
Nonapproved FAA ground schools are visited occasionally by a FAA representative. From 1963 through November 1968, the FAA had no knowledge of a ground school being conducted by either Aircraft or petitioners individually. The airport manager at Paine Field had no knowledge of a purported ground school operated out of the hangar leased by petitioners.
During the years in issue neither Joseph nor Betty nor Lee Easterly had *209 a flight instructor's license. In fact Aircraft was not interested in the business of teaching people to fly. AircraftDealer In January 1962, Aircraft submitted its first application for an aircraft dealer's license to the Washington State Aeronautics Commission (hereinafter sometimes referred to as WSAC). When an application for an aircraft dealer's license is submitted to WSAC it is given to the State Patrol to whom is delegated the responsibility of sending a patrolman out to inspect the business premises of the applicant in order to determine in the first instance whether an aircraft dealer's license should be granted. On February 2, 1962, Officer Harrell of the Washington State Patrol visited with Joseph Curran for the purpose of determining whether the application of Aircraft for an aircraft dealer's license should be granted. During this visit Joseph, who never had an aircraft dealer's license in California, stated that he had a dealer's license in California.
Aircraft's application for a dealer's license was initially declined, however, after communication with the State Attorney General's office, it was granted in August 1962.
On its application submitted to the WSAC *210 for an aircraft dealer's license for 1963, Aircraft stated that it would deal in "Used aircraft only." On its 1964 application to WSAC for an aircraft dealer's license Aircraft stated that it would deal in used aircraft and that it had a franchise to sell "Beechcraft Travelair." In fact, Aircraft did not have a franchise in 1964 to sell the Beechcraft Travelair.
An aircraft dealer by statute [2] in the State of Washington is defined as a "person engaged in the business of selling, exchanging or acting as a broker of aircraft." An original aircraft dealer's certificate cost $25 annually and may be used on aircraft which are held by a dealer for sale, exchange, delivery, test or demonstration purposes solely as stock in trade of the dealer's business. If an aircraft is owned by an aircraft dealer the annual registration fee of $2per year and the annual excise tax based upon one percent of the aircraft's market value does not have to be paid. In addition, the dealer does not have to pay the sales tax when he acquires the aircraft solely as stock in trade. The annual sales tax in 1963 was four percent on all retail sales.
*211 Business Attributes In 1963, 1964, and 1965, Aircraft did not have a telephone number or an address listed in either the white or yellow pages of the telephone directory.
In 1963, 1964, and 1965, Aircraft's advertising expenses totaled $37.44. All of this expense was incurred in 1964, but no explanation is given as to its nature. Aircraft never displayed any aircraft for sale nor did it have any signs or banners on its hangar at Paine Field. Aircraft did not cater to off-the-street trade and did not have a waiting room at its hangar.
Insurance During the years in question Joseph endeavored to control the cost of the insurance coverage for the Travelair. In this respect restrictions were placed on who could fly the aircraft. One restriction required that the prospective pilot have logged a minimum of 250 hours. One hundred of these hours were required to have been 700 logged in a multi-engine retractable gear aircraft. Acting on behalf of Aircraft, Joseph experimented with different insurance policies and agents in order to obtain the broadest coverage for the least cost.
On August 23, 1965, Betty, acting on behalf of "J. M. Curran & Betty Curran individually & dba Claremont *212 Aircraft, Inc." submitted an application for aircraft insurance to the Insurance Company of North America. On the Application for Aircraft Insurance the occupation of the applicant was shown as "Physician & Surgeon." The application contained 15 boxes with captions under the following heading: "Aircraft will be used only for the following purposes." The 15 classifications were as follows: (1) "Private Business and Pleasure"; (2) "Passenger Carrying - Not for Hire"; (3) "Instruction of Applicant"; (4) "Transportation of Employees and Guests"; (5) "Sales Demonstration"; (6) "Acrobatic Flying"; (7) "Passenger Carrying - for Hire"; (8) "Commercial Student Instruction"; (9) "Rental to Others"; (10) "Flying Club"; (11 through 14) "Photography" (a) "High Altitude," (b) "Other"; "Crop Seeding or Dusting"; "Public Exhibition or Contests"; and (15) "Any Other Uses - Give Full Details." On the application in question only the box next to "Flying Club" was checked and the following statement was typewritten: "Group of 5 operating as a club but not registered and plane solely owned by applicant." On the application, the pilots who would fly the aircraft were shown as: "J. V. Curran" and "Betty *213 Curran."
Insurance Company of North America issued an insurance policy to the named insured: "J. V. Curran and Betty Curran Individually and dba Claremont Aircraft Inc." for the period commencing August 27, 1965 to August 27, 1966. In addition, the policy was effective from August 27, 1966 through October 28, 1966. The business of the named insured was shown as "Physician and Surgeon."
Under Item 6 of the above insurance policy the following information appeared:
The Purposes for which the aircraft is to be used are - Pleasure and Business.
If applicable, the term "Special Uses" is defined as - Flying Club - Excludes operations for which a charge is made.
The policy defines "Pleasure and Business" as follows:
The term "pleasure and business" whereever used in this policy is defined as personal, pleasure, family and business uses excluding any operation for which a charge is made.
Endorsement #2 to the above policy provided:
In consideration of the premium charged, it is hereby understood and agreed that Item #6 "Special Uses" shown on the declaration of the below mentioned is amended to read. Flying Club - excluding passenger carrying for which a charge is made.
Endorsement *214 #7 to the above policy provided:
In consideration of the premium charged, it is agreed that any use of the aircraft by persons, firms or corporations for which use a reasonable charge approximating actual operating and overhead costs of the aircraft is made by the owner to such persons, firms or corporations shall not be construed as a use of the aircraft for which a charge is made as set forth in the Declarations of the below mentioned policy.
Endorsement #7 is designed to permit reimbursements of operating expenses. It does not cover a profit-seeking operation.
Income In 1963, Aircraft had gross receipts of $5,551.13. Of this amount $1,181.13 was a service charge for a loan guarantee on the sale of an aircraft from an unspecified seller to a third party. The remainder was aircraft rental of $4,365 and "Ground School" $5. Of this remainder, $4,245 was paid by Joseph, and $120 by Evergreen Finance Company of Chehalis. Evergreen Finance of Chehalis is a partnership in which Joseph had a majority interest.
Of the total gross receipts of $3,694.60 reported by Claremont Aircraft Company, Inc., in 1964, petitioners paid all but $590; and $50 of this amount was paid by Evergreen Finance *215 Company of Chehalis.
A summary of the gross receipts from Aircraft's cash receipts' journal for 1965 is as follows: 701 1965
Received From
Charter ServiceAmount
Advertising IncomeAmount
Upkeep Amount
Total Income
1- 4
$ 160.00
5- 7
Evergreen-Chehalis
$ 150.00
5-14
Curran (5 trips)
1,150.00
5-11
Evergreen-Everett
425.00
5-18
Griffin (To Olympia)
50.00
6- 2
Evergreen Acceptance
100.00
Desco Camera
100.00
Evergreen White Center
200.00
Shopping Center
100.00
Claremont Lab (Statement to Lab)
750.00
6- 3
Desco T.V.
100.00
6- 3
Griffin & Johnson
200.00
6- 3
Evergreen-Marysville
100.00
6- 3
Community-Parkland
100.00
6- 7
Evergreen-Everett
200.00
Parros Kouttas
100.00
6-11
Evergreen-Chehalis
100.00
6-25
Cal Aeronautics
100.00
Cash flight to Ephrata
50.00
6-30
Everett Monte Cristo
700.00
7-20
Drumheller
7.10
10- 4
Cash
5.10
8-6/12-31
Weed
$29.00
Curran (incl. $575.00, $100.00, etc.)
1,035.00
$1,522.20
$3,425.00
$1,064.00
Income, other than sales
$6,011.20
Sales: Mark IV Radio
400.00
Tire
6.00
Radio
300.00
Airplane B95A Beech (Twin) Travel Air
32,400.00
Total Income - 1965
$39,117.20
*216 The advertising income of Aircraft in 1965, totaling $3,425, was received to sponsor the entry of Betty in the 1965 Powder Puff Derby. The bulk of the $3,425 was received from business in which petitioners had an interest. The costs incurred in getting the aircraft in shape for the derby exceeded the $3,425 received by Aircraft. The books of Aircraft were kept in a looseleaf notebook binder. For the calendar year 1963, Aircraft claimed as a tax deduction a "cost of goods sold" expense of $10,101.56. All but $101.56 of the "cost of goods sold" expense figure was arrived at by writing down the fair market value of the Travelair from $48,000 (cost) to $38,000 (inventory). For the calendar year 1964, Aircraft claimed as a tax deduction a "cost of goods sold" expense figure of $4,000. The "cost of goods sold" expense was again arrived at by writing down the fair market value of the Travelair from $38,000 to $34,000. Rates In 1963 and 1964, the rate charged to charter the Travelair was usually $30 an hour. This rate included gas. In 1965, the rate charged to charter the Travelair was usually $50 an hour. Again this rate included gas. The rates charged to charter aircraft for *217 the years 1963-1965 were the highest rates which petitioners believed the market would bear. In 1963, Joseph, Betty, Lee Easterly, Bill McCloud, Bill McKean, and George Spooner logged time in the Travelair. In 1963, Joseph recorded in his flight record and log book 32:15 hours which he logged in the Travelair. In 1963, Betty Curran recorded in her flight record and log book approximately 188 hours which she logged in the Travelair. Of the recorded hours logged by petitioners in 1963, approximately two hours were duplications, i. e., petitioners were together in the aircraft during the flight when the hours were logged. In 1963, the other individual pilots referred to above also logged a "few hours" in the Travelair. In 1963 and 1964, Betty logged an unspecified amount of hours in the aircraft for personal pleasure. Some of the hours logged by Betty in the years in issue for personal pleasure were flown in connection with flight instruction she was receiving so that she could obtain a higher instrument rating. 702 Powder Puff Derby In 1961, 1962, and 1965, Betty entered the All-Women's Transcontinental Air Race, popularly called the "Powder Puff Derby." On all three *218 occasions her co-pilots were housewives. The All-Women's Transcontinental Air Race in 1961 was the first race that Betty had entered although she had been flying since 1959. Cash prizes for finishing in one of the top four spots in the Powder Puff Derby are: First Prize
$1,000 plus a trophy
Second Prize
800 plus a trophy
Third Prize
600 plus a trophy
Fourth Prize
400 plus a trophy If Betty had won the Powder Puff Derby in any of the years in which she entered, the prize money would not have covered the costs associated with participating in the race. Based upon the costs associated with participating in the Powder Puff Derby, Betty at the time of entering the races did not have a good faith expectation of making a profit. Betty is a member of the Ninety-Nines, which is an international organization of licensed women aircraft pilot enthusiasts. In 1965, Betty was vice president of the Paine Field Chapter of the Washington Pilots Association, which meets monthly. In 1965 it had a membership of over 50 members. The main purpose of the Washington Pilots Association is to promote interest in flying, flight education and safety, and insure better and safer flying *219 in the State of Washington through legislation. On petitioners' 1964 individual income tax return, they claimed as a tax deduction amounts totaling $2,309.60 paid to Aircraft for "Aircraft rental Demonstrations"; on August 12, 1964, of $379.60; October 13, 1964, of $1,080; and on December 31, 1964, of $850. These demonstration rides were given to individuals by petitioners allegedly for the purpose of selling the Travelair. When the demonstration rides were given, petitioners were acting on behalf of Aircraft. Petitioners also claimed as a tax deduction an amount totaling $475 paid to Aircraft for "Aircraft rental"; on September 11, 1964, of $315, and on December 14, 1964, of $160. The amount of $2,309.60 for "Aircraft rental Demonstrations" and $315 of the $457 for "Aircraft rental" that petitioners claimed on their individual tax return was reflected in the total gross receipts of Aircraft for the year 1964 but the $160 item was not. In his statutory notice of deficiency to Joseph for 1963, respondent determined that: (e) Examination of the books and records of the Sub-Chapter S Corporation known as "Claremont Aircraft, Inc." discloses that the corporation did not establish *220 that there was a valid business purpose for which the claimed loss would be allowable. Therefore, the claimed loss of $9,535.24 is disallowed. One-half of this amount, or $4,767.62, represents your community one-half share, and one-half is attributable to your wife Betty Curran. Accordingly, your taxable income is increased in the amount of $4,767.62 * * * In his statutory notice of deficiency to Betty for 1963, respondent increased her taxable income by $4,767.62. This represented her community one-half interest as determined above. In his statutory notice of deficiency to Betty and Joseph for 1964, respondent determined: (d) Examination of the books and records of the subchapter S Corporation known as "Claremont Aircraft, Inc." discloses that the corporation did not establish that there was a valid business purpose for which the claimed loss would be allowable. Therefore, your distributable loss is reduced to zero and your taxable income increased in the amount of $4,339.62 computed as follows: Ordinary Loss per corporate return
$4,339.62
Add: Unallowable deduc- tions
$8,039.22
Less: Reported receipts
3,699.60
4,339.62
Corrected corporate loss
$-0-
Your distributive share
$-0-
Corporate Loss reported on your return
4,339.62
Overstatement of Corporate Loss
$4,339.62
*221 The deduction of $8,039.22 claimed as operating expense less the reported receipts of $3,699.60 has been disallowed because it has been determined that the corporation has not established that it was formed for a business purpose. Opinion The controlling question for decision herein is whether Aircraft, a subchapter S corporation, was carried on as a trade or business for profit or whether its activities were such that they were motivated by the personal consideration of Joseph and Betty, the petitioners. 703 The question of what constitutes the carrying on of a trade or business for profit has been dealt with many times. See e. g. Deputy v. duPont, 308 U.S. 488, 499 (1940); Doggett v. Burnet, 65 F. 2d 191 (C.A.D.C. 1933); American Properties, Inc., 28 T.C. 1100, affd. [59-1 USTC 262 F. 2d 150 (C.A. 9, 1958); Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). Essentially the acid test is a subjective one, i. e., whether the intentions of the taxpayer as to the *222 particular enterprises were to carry on a business for profit. American Properties, Inc., supra. An intention, however, is a question of fact and generally a decision is reached only after a thorough consideration of all relevant evidence. Such evidence not only encompasses direct testimony but those external factors such as business conduct, outward manifestations to the public at large, the time both available and devoted to the particular enterprise and the particular attributes of the enterprise. Petitioners' basic argument is that at all pertinent times their intent was to engage in a business and operate it for a profit. On brief they argue generally that their aviation activities constituted a trade or business. We find and hold otherwise. Petitioners were allegedly engaged in three aviation activities: Ground School; Aircraft Sales; and Chartering. Before treating each of these activities specifically, we shall first delineate those factors that are common to all three activities and which we believe militate against a holding that Aircraft was engaged in a trade or business. In Deputy v. duPont, 308 U.S. 488, 499 (1940), Justice Frankfurter, *223 in a concurring opinion (joined by Justice Reed), stated: To avail of the deductions allowed by * * *, it is not enough to incur expenses in the active concern over one's financial interest. "* * * carrying on any trade or business," within the contemplation of * * *, involves holding one's self out to others as engaged in the selling of goods or services. We agree with this statement, and observe that throughout the record of this case, Aircraft's alleged business was most unusal in its complete lack of business attributes. Aircraft was allegedly operated out of the building at 5007 Claremont Way. However, 5007 Claremont Way was the address of petitioners' clinic and there were no signs at this address to indicate that Aircraft was located there or that it conducted business from that location. Nor did Aircraft have any signs or banners on its hangar at Paine Field. In addition, Aircraft did not maintain regular business hours at any location and its hangar at Paine Field did not have a waiting room. Further, it did not have a listed telephone number in either the white or yellow pages *224 of the telephone directory. Aircraft's only advertising expense during the years here in issue was $37.44, and petitioners have failed to state just what it was for. Finally Aircraft did not have any employees. While all of the above factors if taken individually might not be fatal to petitioners' argument, we find that when viewed together they negative any intention to engage in a business activity for profit. We observe further that Aircraft's applications for insurance in 1965 and its lease of a hangar at Paine Field cast further doubt on petitioners' intentions with respect to Aircraft's business activity. In Aircraft's lease applications Joseph scratched out the provision prohibiting a lessee from engaging in a commercial aircraft business without the approval of the airport manager. The airport manager testified at trial that Joseph told him that he had an interest in an airport in California and a radio dealership and, therefore, did not believe that the provision was in harmony with his other interests. In Aircraft's insurance application for 1965, signed by Betty, the designated use of Aircraft's sole aircraft was "Flying Club". Although the application contained *225 fifteen boxes with captions among which were: "Instruction of Applicant"; "Sales Demonstration"; "Passenger Carrying - for Hire"; "Commercial Student Instruction"; "Rental to Others"; and "Flying Club"; only the box next to "Flying Club" was checked. Petitioners argue that the conflicting evidence contained in the airport manager's testimony and the insurance application is explained by their desire to keep costs at a minimum. Notwithstanding that petitioners' explanation casts a shadow on their overall credibility, we believe under the facts of the present case that the lease and insurance application reinforce our ultimate conclusion that Aircraft's activities were not 704 business oriented, but rather, were tuned to the personal activities of the petitioners. In essence we believe that when it was financially advantageous for petitioners to categorize Aircraft as a trade or business, they did so; and when it was not to their personal benefit they held themselves out otherwise. Standing alone, this in itself is not crucial, if the overriding considerations are business oriented, but we believe from all the evidence herein that the overall consideration was one of minimizing *226 the expenses of petitioners' personal flying activities. We now direct our attention to Betty's flying activities. In 1961, 1962, and 1965, Betty entered the "Powder Puff Derby." On all three occasions her co-pilots were housewives, and her expenses far exceeded any prize she could have won for Aircraft. It is evident from the record herein that Betty was a flying enthusiast. She was a member of the Ninety-Nines, an international organization of women aircraft pilot enthusiasts. In addition she was, in 1965, a vice president of the Paine Field chapter of the Washington Pilot Association. We find that the sponsorship of Betty in the Powder Puff Derby by Aircraft was motivated by personal rather than business considerations. Indeed, Betty herself testified that because of the costs associated with the race she did not have a good faith expectation of making a profit. Analysis of the purported gross income of Aircraft shows, inter alia, the following: In 1963 the total receipts were $5,551.13. Of this amount $4,245 was paid by Joseph and Betty. One hundred-twenty dollars was paid by Evergreen Finance of Chehalis, in which Joseph had a majority interest. Five dollars was received *227 from "Ground School." The remainder of $1,181.13 was an interest override for placing and allegedly financing the purchase of an aircraft from an unspecified seller. In 1964 the total gross receipts of Aircraft were $3,694.60. Joseph and Betty paid all but $500 of this amount. During 1963, $30 was the average hourly rate charged to rent the aircraft. By dividing the $30 hourly average rate into the rental income of $4,365, it can be seen that Aircraft was paid for approximately 145.5 hours that were logged in the Beech Travelair. By comparing the hours that were logged in the aircraft by petitioners, it is obvious that a substantial number of hours were flown in the Travelair by petitioners for which no payment was made to Aircraft. The individual flight and record logs kept by the petitioners disclose that in 1963 they together logged approximately 220 hours in the Travelair. In addition to the hours logged by petitioners, four other pilots logged a "few hours" in the Beech Travelair. Consequently, there was a minimum of about 70 hours logged in the aircraft for which no charge was made. Ground School Consistent with its Articles of Incorporation, Aircraft stated in its corporate *228 tax return for 1963 that its business was "Aircraft Sales, School & Charter." In its 1964 income tax return, Aircraft stated that its business was Aircraft Sales & Charter. We believe that there is no question that Aircraft was not in the business of operating a ground school. Primarily, we observe that Joseph, on cross-examination, stated that Aircraft was not interested in teaching people to fly. We observe further that Joseph, Betty and Lee Easterly did not have instructor's licenses. Moreover, neither the FAA nor the airport manager had any knowledge of a ground school being conducted at Paine Field by Aircraft. We also note that, except for $5 shown in Aircraft's 1963 cash receipts journal and labeled as "Ground School," Aircraft did not report any income from the operation of a ground school. Taking all of these facts together we find and hold that petitioners have failed to demonstrate that Aircraft in 1963 and 1964 was in the trade or business of operating a ground school. Aircraft Dealer On its 1963 application to the Washington State Aeronautics Commission, Aircraft stated it would deal in "Used aircraft only." On its 1964 application Aircraft restated that it would *229 deal in used aircraft and that it had a franchise to sell Beechcraft Travelair. In fact, Aircraft did not have a franchise to sell Beechcraft Travelair. Moreover, Aircraft never displayed any aircraft for sale and had only one airplane during these years. As noted above, Aircraft in 1963 reported $1,181.13 as an interest override for placing and financing an aircraft purchase 705 through an unspecified seller. This was the only income item in 1963 and 1964 having any nexus to the sale of aircraft. Further, as set out above, we noted that the recipient of a dealer's license is conferred with certain local tax advantages. It is our belief that the securing of such a license for Aircraft was primarily if not wholly motivated by the savings that would inure to petitioners' personal flying activities. We conclude from all of the above that Aircraft was not engaged in the trade or business of an aircraft dealer during the years in question. Chartering During the years in question Aircraft never had an "air taxi/commercial operator (ATCO) operating certificate." Thus, if petitioners flew charter flights during these years they violated FAA regulations. We do not pass on Aircraft's *230 failure to comply with FAA regulations by not having a required air taxi certificate for its alleged charter operations; we do, however, view this failure to comply with the uniform minimum requirement as one more indication that Aircraft's operations were dominated solely by petitioners' personal flying activities, without regard to the operation of a trade or business. Thus, considering the above and all the other criteria heretofore discussed, we find and hold that Aircraft was not, during the years in question, engaged in the trade or business of service. Section 1374 of the 1954 Code provides that the net operating loss deduction shall be considered as a deduction attributable to a trade or business carried on by the shareholder, and section 1.1374-2, Income Tax Regs., provides: Application with other provisions. The deduction allowed shareholders by section 1374 shall, for purposes of chapter 1 of the Code, be considered as a deduction attributable to a trade *231 or business carried on by the shareholder. Thus, it is allowable in computing adjusted gross income, and is not subject to the limitations of section 172(d)(4) (relating to nonbusiness deductions) in computing the net operating loss of a shareholder. Also, it is a deduction of the type on which a limitation may be imposed under section 270 (relating to "hobby losses"). We think it is clear that the nontrade or business activities here dealt with were not transformed into trade or business activities, and therefore deductions, by the simple expedient of performance by Aircraft rather than its shareholders. Decisions will be entered under Rule 50. Footnotes
1. All references herein are to the 1954 Code unless otherwise stated.↩
a1. Interest, but uncertain as to amount.↩
a2. Majority interest.↩
2. Sec. 14.20 et seq. Wash. Rev. Code Ann. (1957).↩